We're happy to hear argument in our first case, number 16-1979. Mr. Velasco Padilla v. Troxell. Ms. Powers. Good morning, Your Honor. Good morning. May it please the Court, Kelly Powers, Counsel for the Appellant, Ms. Padilla. In our submission, where this case went fundamentally wrong in the lower court is where the lower court lost sight of this particular family's reality. The appellant, the mother in this case, is a very young, very poor, uneducated mother living in Mexico. When we analyze her actions in the case, we must do so through the framework of her reality, not through the framework of our own reality or the lower court judge's own reality, which will, from our position of relative privilege, be fundamentally different than the mother's. No. You can't be saying that we do not give the appropriate weight to the district court's credibility determinations. No. What I'm saying is when it comes, in particular, to the consent defense, where we say is the looking at the subjective intent of the mother and whether she subjectively intended to allow the child to come to the United States illegally with human traffickers to meet the father here and stay here forever. When we analyze the mother's subjective intent, we have to look at the actions she took that  Now, when we look at the consent exception that was put forth. Can I just ask you a question about what you just said? Is it your position that if your client consented to her son being removed to the United States, that's not enough? She had to consent to removal by way of smuggling? No, our position is she did not consent. I understand, but that doesn't really answer the question. So long as she consented, it doesn't matter whether or not she knew it was going to be by way of smuggling. That's your position? No, our position is for one to consent, the person whose consent is sought or alleged has to understand and consent to the nature and the scope of the removal. And you think that includes the method of removal? Yes. We say it does. It does include the method.  I would like to know the flight or the train schedule. I mean, where does that argument go? That doesn't seem really clear. Consent is consent. I consent to you leaving the country with this person and living with this person. It wouldn't seem to me that necessarily that would include how you left the country. So where do you get that additional clause? We get that from the Nicholson case and the Darin case, both from the First Circuit. And the reason we say the method of removal is relevant in this case is that the testimony in the lower court indicates there was no plan at all. If you look to page 20 of the appellant's brief where we highlight the relevant testimony, in order for one to consent to the nature and the scope of an alleged removal,  we do know, do we not, that she took the child to the passport office. Isn't that a manifestation of willingness to enter another country? I'm trying to understand. And we still haven't grappled with the difficulty that I have that you have never challenged the district court's credibility determinations, which are critical here. And he says, I cannot find petitioner's version of events to be true. Right. If you look to the testimony set forth on page 20 of the appellant's brief, which is also on pages 537 and 611 of the appendix, in our submission, even if one takes as credible the father's version of events. Well, one has to. That's my precise point, is that you have to, do we not, because you have not challenged the district court's credibility determinations that are not in your client's favor. So, as a threshold, why do we not have to take the father's testimony as true? You're correct, Your Honor. We did not challenge the lower court's credibility determinations. And if you look to the father's own testimony, which was determined by the lower court to be credible, when asked by the mother's counsel, this is on page 611 of the appendix, the mother never told you she wanted you to bring her son illegally into this country without her, did she? But she did say, he did say, that the child, he took the child to the passport, she took the child to the passport office, and the mother told the father that the child would be better off living in the United States with the father. Right, and we say that statement alone does not, that statement does not equal consent. Saying one would be better off somewhere is not one giving affirmative permission that yes, my child would be better off there and you can take her, you can take the child there indefinitely with no plan ever to come back to Mexico when I don't even know what the plan is. It's about different points in time. It seems to me that you started out talking about entry to the United States and then with respect to remaining in the United States, you have at best conflicting testimony, do you not? For instance, a message that from the mother saying, you forward $3,000 please and I will give you guardian in custody? That she was willing to have the child remain in the United States as long as the father provided money? We say that goes to the acquiescence argument, which is a different analysis than the consent argument. Well, you say that, but we're the ones that are going to make the call. Yes, understood, and the acquiescence argument... But why doesn't it go to the consent argument? Because it's after the fact. It's after the time the child actually left Mexico. Well, it's a reaffirmation, arguably a reaffirmation of consent. Respectfully, we would disagree with that and we would say that because it's after the fact, there physically was nothing the mother could have done at that point to get the child back. Well, one of the things she could have done is said to him, I want the child back now and you never took him. All these messages don't support your view that she didn't consent. If you look at the messages in the acquiescence context and through the eyes of a desperate, poor mother, what they demonstrate is a mother grasping for anything while her Hague Convention application was pending, which for reasons that are not clear anywhere, it took nine months for the Hague application to get from the Mexican Central Authority when the mother filed it within three weeks of learning that the child was in the United States. After she was called by border... But that could also be read as her using the situation and the petition for leverage. All of these, what you are positing, can be read favorably to your client. Correspondingly, they can equally plausibly be read unfavorably and the district court has told us that the district court did not credit your client's version. The district court has told us, however, that it credited the father's own testimony and the father's wife's testimony and in each of their respective testimony they confirmed there was no plan to which the mother could have agreed. When you say there was no plan, this is a question for me about the record. Did the father say she agreed, the mother agreed to have him come to the United States but there was no plan? Is that your argument? Or did he not say the mother agreed to let him come to the United States expressly? Right. I don't see anywhere in the record that anyone says the mother ever expressly said the child may go to the United States. It's more that there isn't the argument more there's sort of an inference. She said you can have custody and everybody knew he was planning to go to the United States and the passport office and when you put it all together when she said you can have custody you can read that maybe as her saying in the United States. The statement about the father having custody came in a text message almost a year after the child had been in the United States. The inference the lower court made was that because the family all went together to the passport office to obtain a passport not only for this child but for another child of the father's that leads to the inference that the mother consented to the child's removal to the United States. The record shows that the other child wasn't removed to the United States. They obtained two passports for two children only one child was taken to the United States. The day after the passport was obtained the record shows that the mother filed a police report with respect to the father having taken the child away from her. Two months after that the mother received a call from border agents in Texas saying we have your son. He was brought here by human traffickers. At that point what the mother said was no I did not consent for the child to be taken to the United States and I'd like him back. The border agents released the child to the father. Within approximately three weeks of the border agents releasing the child to the father the mother filed her Hague application with the Mexican Central Authority. The father's wife at the evidentiary hearing testified that she was asked did the father tell you about his plan to bring the child into the United States after he picked him up in December 2014. The father's wife says no there was no plan. So  the mother here could not have consented to the child's removal to a plan to bring the child to the United States that didn't exist. It doesn't say that there has to be a plan it has to she has to consent to the fact of as evidenced by her words and actions the underpinnings of which the district court discredited. Darren and Nicholson say that what the petitioner actually contemplated and agreed to as well as the nature and scope of the petitioner's consent including any conditions or limitations should be taken into account. And here what we don't have anywhere in the record is any expressed statement by anyone as to what the proposed nature and scope of any removal was going to be if the mother even knew there was going to be a removal to the United States. And just I see I'm running out of time if I could just point out highlight a few points in the acquiescence argument that I'm sure you have read in the briefs already. Can I ask you a quick question? Is it your understanding that the district court made a separate finding that the notwithstanding consent there was the father had also met his burden of showing acquiescence is that a finding by the district court? Yes, based on the district court citation to the text messages between the parties I know the district court uses the word acquiescence. It wasn't obvious to me that that captured a legal defense rather than just it seems like she was okay with this. Right. We felt we needed to address that in the event it is taken as a specific finding by the district court. Our position is yes the district court found acquiescence. Do you have authority for the proposition that we have to treat them as exclusive? Could we treat the district court's comment as an alternative? Even if we view it as a finding? In the Nicholson case and the Darin case again they set out the differences between consent and acquiescence. My question is are they mutually exclusive? Do you have to find them do you have to find either or? Can they coexist? No they can't coexist. It's also in the Nicholson and Darin cases. The reason for that is I do not read them as saying that they are mutually exclusive. Tell me when you get a chance if you would the language that says that you can't have both. Right. Because that was my question. As a logical matter you can't have both. So you don't have any authority legal authority for the proposition that you cannot have both. Do you understand my question? Yes I do understand your question. And I understand that you don't think you should be able to find both. But Nicholson and Darin I read them perhaps incorrectly but I did not read them for the proposition that you cannot have both. And I'm trying to make sure that that our mutual, our understandings are not mutually exclusive. We read Nicholson and Darin for the proposition that you can't have both. Because if one finds consent then there wouldn't be later acquiescence. If you can find that language for me that would be lovely. Thank you. Good morning. Good morning Your Honor. And may it please the Court. Chris Mischel for Respondent Appellee Joe Troxell. After a bench trial in which the District Court heard live testimony from both parties and other witnesses weighed the credibility of the witnesses and asked questions of its own and considered hundreds of pages of evidentiary submissions, the District Court found as a matter of fact that Petitioner consented to or acquiesced in the removal of the child to the United States. Petitioner does not challenge those findings as clearly erroneous and even today does not contest the District Court's credibility determination which the District Court made after giving Petitioner the benefit of the doubt. Well, don't you think it's unlikely that the mother would have consented to having her child smuggled, her small underage child smuggled into the United States by strangers? Your Honor, that was not the argument that Petitioner made in the District Court. I don't Mr. Troxell has testified that she didn't consent to any particular method of removal including that particular method. How does your client justify that? Well, Your Honor he said that it's a regrettable decision that he would not do again. Your client? The age to be the grandfather of this child. That's correct, Your Honor. However, I would point out that the hate convention is asking a very narrow question which is what is the venue for the ultimate custody determination? It's only asking the question of whether the Petitioner in this case consented to the removal, not any particular method of removal and that makes sense because the convention itself is only asking which country is going to ultimately have the custody proceeding. There are other questions that can be answered in the custody proceeding later on. There are other questions. You have authority that says you don't look at the kind of removal? I think our best authority, frankly, Your Honor, is that we can't find any cases that have analyzed that question at all. No cases talk about the manner, the form, none of that? They don't. Colleagues seem to suggest that they did. Your Honor, I haven't seen those cases. I do think a illustrative case is this Court's recent Alcala decision in which there was admitted smuggling into the United States. I think that's at page JA 251 in the Alcala Joint Appendix and this Court found that there was smuggling into the United States, that the parents were here working illegally, that they were conceitedly not paying federal income taxes and didn't factor that in at all to the Hague Convention dispenses or the Article 18 determination. How long was the child in neither the mother nor the Well, Your Honor, there was a brief period, I think it was a matter of hours at the border and to answer your question fully, there was also a period of about two months when the child was in state court custody here in the United States. And this child is five? Yeah, he'll be six in May. So he's younger than that? He was four when all this took place? He was, Your Honor. Please refresh my recollection. Why was he in state court custody? The petitioner originally brought this petition in state court. I can get into that in more detail if you want. That's fine. You do have these conflicting text messages that counsel for the mother point to. I don't care about the money, what I care about is getting my son back. Doesn't that demonstrate that she didn't show a consistent attitude of acquiescence? Well, Your Honor, I think as the district court pointed out, that is the sole outlying text message in what I think is about 150 pages of reproduced text messages in the joint appendix. Well, I don't know because it seemed to me that a lot of those text messages actually did sound like exactly what you would get if a woman's child was kidnapped. How is he? If you let me see him, I promise I won't make any trouble for you. It's not me filing the legal actions. Don't blame me. Just let me see my son. I mean, they're kind of heart-rending. I feel that a lot of them are at least ambiguous. I think that's fair to say, Your Honor. I do think on the other side, surely there are text messages where she says he's better off with you in the United States. There's of course many text messages where she's asking for money. I think what's actually conspicuously absent from these text messages, though, is any suggestion at all that she objected to the child being smuggled into the United States, that she used the passport as some kind of implied consent that he would be moved in the United States legally. Surely, if that was her position in this case, she would have said it at some point in these six months' worth of text messages. Or at the trial, where she also never made that argument. But you do acknowledge that there is a level of ambiguity in her communications. The one that's a little hard to swallow is the you forward $3,000. That one's a little hard to reconcile. The problem I'm having is what we do about the judge's credibility determination, which doesn't seem to be, which is a challenge. Do you think that the judge made a findingist acquiescence? I do agree with my friend on the other side that there is an acquiescence finding. It's manifested, I think, in a footnote and in some other places. It's not as robust as the consent finding, but it is an alternative holding. I think this court could affirm on either basis. I would take it that you disagree with your colleague that acquiescence and consent are mutually exclusive. I do disagree. In a metaphysical sense, I suppose I can see how they're distinct, but I think they're quite plainly alternative holdings in this case. I think the reason that they blur together is that the same evidence supports both defenses. There's actually a case in the Ninth Circuit, the MENA case that we cited in our brief, in which the Ninth Circuit holds that you can consider post-removal evidence as probative of consent when the evidence is read to go to the state of mind of the petitioner before the removal took place. I think that's precisely what the district court was doing when it looked at all these text messages and said, where is she saying that she doesn't consent? Surely, if she didn't consent, she would be saying that over and over again. Instead, she's not saying it at all. I'm not so sure. Going back to my colleague's original question, I'm not so sure that's true. If she wants to get her child back, she's not going to be arguing you were really wrong, and you kidnapped this child. She's going to be saying all the things she can say that would sue the way for getting the child back. I'm not sure that's very determined. That's fair enough, Your Honor. I would submit, however, that this is in the heartland of the district court's discretion to look at this evidence, to look at the credibility of the respective parties, which as we've said, the district doesn't challenge here, and to make a determination based on that live testimony, who he thought was credible. I think, in fact, this court's only consent case is the Smedley case of 2014, and that case turned largely on a credibility determination. It was a slightly different set of facts in that it was a German court, a foreign court, that made the credibility determination. But this court said, in family law matters, simply you often have a difference of accounts between two parties, especially when they're dealing with each other on a relatively informal basis as they were here, and sometimes the district court just has to decide. And I think this district court held a full-day bench hearing. Both parties were able to present their witnesses. The district court actually had also heard from both parties in the TRO hearing in June. The district court looked at a great deal of evidence, ultimately gave Petitioner the benefit of the doubt as to language barriers. I have a question about the district court findings. Did the district court make a mistake when it was going through the facts and mix up the mother and the grandmother? Is that what's going on there? I know what you're talking about, Your Honor. I do think that's probably the best reading of it. A little troubling, isn't it? I don't think much turns on that. Hard to say, isn't it? Well, I... If he was right that it was the mother who went to the father and said, I'm wondering, I want to talk to you about my desire to live in the United States, and maybe my son would be better off with you, that seems... How do we know that that didn't influence the district court's... I mean, he just mixed it up, right? He got the wrong person. Your Honor, I think at most that would be harmless error given everything else that the district court found, you know, based... First of all, based on Mr. Troxell's own testimony, which was... Did Mr. Troxell say expressly, the mother agreed to let me take the son into the United States? I would look at page 623 of the appendix, Your Honor, when Mr. Troxell is asked about why she got the passport. He says, that's why she's agreeing to get the passport. Then we can go into the procedure to bring Jeremy into the United States. I think that's pretty clear. I would also look at his wife's testimony where she says there was discussion kind of at the dinner table during this meeting before they went to the passport office in which there was discussion of a city in the United States, and that's at 633 and 635, which I think also confirms that they were talking about moving to the United States. That's what I understood your argument to be, that maybe there's nothing exactly where the father says, she said I could bring him into the United States, but there's a lot of talk about... He does say she said he'd be better off with me, and she knew what I was talking about. And that was sort of on the table, and so you could make that inference. Is that the idea? You're right. I think the district court could indeed make that inference. And given the combination of the unchallenged credibility determination and the lack of any real assertion of clear error, I think it's a fairly straightforward basis to affirm the district court on that. Am I remembering incorrectly that there was evidence in the record that the mother knew in advance that the father planned to resettle permanently, or at least for some long duration of time in the United States? Well, Your Honor, I believe the mother was aware that he, of course, that... My recollection is there was something in the record about the mother's, and it may have been from the father's testimony, which the district court credited. Am I remembering that incorrectly? I think you're right. I don't have a citation off the top of my head, but you know, at this time, Mr. Troxell had gotten a K-1 visa, a fiance visa, to move with his wife to the United States. That was part of the discussion that was going on when they went to get the passport, so I think that would be advance notice. Of course, as we just discussed, Mr. Troxell's wife testified that they discussed moving to a city in the United States, so I do think she had advance notice that that was going to happen, and there's nothing at all in the record from her own testimony or otherwise to suggest that she didn't. So I think, you know, given the credibility finding, and this Court's holding in Smedley, along with the Ninth Circuit's holding in Mena, which I think is probative here and does rely on a similar inference from a passport, as well as what they call the credible and consistent testimony from one of the parties that was credited in the face of a finding that the other party was not credible, there's a clear basis to defense. I would also say there's a clear basis to affirm on the acquiescence defense, and the evidence is similar for both. You know, we've discussed that briefly, but I think this is the rare case in which you have sort of six months of documented conversation between the parties and does fit into the third category of acquiescence that this Court has recognized in its cases about a consistent attitude of acquiescence over a significant period of time. Of course, this Court doesn't need to reach that acquiescence question if it affirms on the consent basis, and I think that's a perfectly good way to resolve the case. If there are no further questions, thank you. Thank you very much. Flowers, do you have rebuttal? If I could first address Judge Duncan's previous question for my argument in chief. We would say the strongest authority supporting that there can only be consent or acquiescence is the plain language of Article 13A of the treaty, and the logic that follows, if one consents, there could be no acquiescence. To address the point raised by my colleague with respect to... Logically, analytically, if you get to consent, you don't have to go into acquiescence. My point really sort of went to the, what seems to me, what could very easily happen and could have happened here, and that is that the same evidence could easily reflect alternatives. Alternative findings of either one. That was all. Right, and to answer your question on that point, the level of formality that is required with respect to acquiescence, we say would not support consent, because consent happens before, acquiescence happens after, and requires a different level of formality. On the contrary, I was just focused on what I understood appeared to be your assertion, that you couldn't have that, and I don't think that's worth me more of your time. And to address my colleague's point with respect to the purpose of the convention being for the state of habitual residence to address the substantive rights of custody with respect to the child, I would direct the court to footnote four of the district court's opinion, where the district court states that custody, and even though I'm not ordering it, I highly recommend that everybody go back to Mexico and deal with custody there. And we say that supports an appropriate use of the court's Article 18 authority to send the child back at any time. You didn't make a request for the exercise of Article 18 discretion, did you? In the lower court, trial counsel did not make that request, no. In our submission, any court can entertain an Article 18 request at any time. And with respect to my colleague's position on the text messages establishing an acquiescence exception, in our submission, the formality required in acquiescence is not satisfied by text messages sent by a desperate parent with no alternative to get her child back. You know, you didn't talk about the affidavit of the mother's half-sister. Yes, the affidavit of the mother's half-sister we say should have been excluded on the basis of hearsay. But it doesn't appear that you objected below either. So, trial counsel got as far as objecting to the authenticity of the affidavit. The lower court then instructed trial counsel to put forth no further objection and that the lower court would conduct its own research. There wasn't. And because the lower court instructed counsel to stop, our position is he did not have the opportunity to put forward the hearsay objection on that point. Counsel has to make a record. In reading the transcript, it shows that counsel wasn't provided an opportunity to finish his argument with respect to that particular exhibit. I'm very sorry, but I've been in a position of saying, I'm sorry, Your Honor, I have to make the record. I understand that, and for reasons that are set out in the... I do understand your point. When the lower court specifically instructed trial counsel to stop, he stopped. We say it's not harmless error to have considered the affidavit because it's expressly relied upon in the lower court's opinion. To finish the point with respect to acquiescence, there are text messages over a six-month period of time, but those text messages were sent, as Judge Motz pointed out, after the mother had already submitted her hate convention application and are, as Judge Harris pointed out, indicative of a desperate mother saying anything she can to try to persuade the father... But equally indicative of her using litigation as a bargaining chip. The problem with a lot of the testimony is that it can be interpreted two ways, and the district court has already been pretty clear about how it interpreted it. Well, the text messages, we say, are separate from the district court's interpretation with respect to the mother's testimony. When the district court read the text messages and has to put them into context, in our submission, they don't demonstrate a consistent attitude of acquiescence over a sufficient period of time with the formality required to establish that defense. Thank you. Thank you very much. We will come down and see a lot of the testimony to our next case. And, Mr. Michel, I understand that you are court appointed. We very much appreciate your efforts.
judges: Diana Gribbon Motz, Allyson K. Duncan, Pamela A. Harris